**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSE ENRIQUE ALBERNI,
            *Petitioner-Appellant,*

v.

E.K. MCDANIEL; FRANKIE SUE DEL
PAPA; STATE OF NEVADA,
            *Respondents-Appellees.*

No. 05-15570

D.C. No.
CV-01-00725-DWH

OPINION

Appeal from the United States District Court
for the District of Nevada
David Warner Hagen, District Judge, Presiding

Argued and Submitted
February 16, 2006—San Francisco, California

Filed August 9, 2006

Before: Arthur L. Alarcón and M. Margaret McKeown,
Circuit Judges, and H. Russel Holland,*
Senior District Judge.

Opinion by Judge Alarcón;
Partial Concurrence and Partial Dissent by Judge McKeown

*The Honorable H. Russel Holland, Senior United States District Judge
for the District of Alaska, sitting by designation.

## COUNSEL

Paul G. Turner, Assistant Federal Public Defender, Las Vegas, Nevada, for the petitioner-appellant.

John M. Warwick, Office of Attorney General, Criminal Justice Division, Carson City, Nevada, for the respondents-appellees.

## OPINION

ALARCÓN, Circuit Judge:

Petitioner José Enrique Alberni appeals from the order denying his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Mr. Alberni was convicted of Second Degree Murder With Use of a Deadly Weapon in Nevada state court. He argues that his Fourteenth Amendment due process rights were violated by the introduction of character evidence at his trial and that his Sixth Amendment right to conflict-free counsel was violated by his trial counsel's cross-examination of a prosecution witness who had been his attorney's client. The Nevada Supreme Court's conclusion that Mr. Alberni's right to due process was not violated was not contrary to and did not involve an unreasonable application of federal law. We vacate and remand for an evidentiary hearing to determine whether Mr. Alberni's right to conflict-free counsel was violated.

## I

We first consider whether Mr. Alberni's due process rights were violated by the introduction of propensity evidence at his trial.

## A

On Christmas Day, 1994, Mr. Alberni shot and killed his friend Dennis McElroy. At trial, Mr. Alberni claimed that the shooting was accidental. The jury was persuaded that it was deliberate and convicted Mr. Alberni of second degree murder.

During the trial, the prosecutor introduced evidence of Mr. Alberni's past violent actions and explosive temper and relied heavily on that evidence in his closing argument. In his direct appeal to the Nevada Supreme Court, Mr. Alberni argued that

the admission of the propensity evidence and the prosecutor's argument violated his right to due process. The Nevada Supreme Court concluded, without an explanation of its rationale, that no constitutional error had occurred. The Nevada Supreme Court determined that a photograph of Mr. Alberni with a gun was relevant to show Mr. Alberni's familiarity with guns, in order to rebut his claim that the shooting was accidental. As to the other evidence of bad acts, it held that the admission of such evidence was harmless in "light of the overwhelming evidence of Alberni's guilt." The Nevada Supreme Court also concluded, without analysis, that the prosecutor did not engage in misconduct in alluding to the prior acts evidence in his argument to the jury.

**B**

Mr. Alberni argues that the introduction of the propensity evidence, and the prosecutor's comments on that evidence, violated his due process rights under the Fourteenth Amendment. A district court's decision to grant or deny a petition for habeas corpus is reviewed *de novo*. *Daniels v. Woodford*, 428 F.3d 1181, 1196 (9th Cir. 2005).

Under the Anti-terrorism and Effective Death Penalty Act ("AEDPA"), a state prisoner is entitled to relief under § 2254 regarding a claim adjudicated on the merits in state court if the decision of the state's highest court either is contrary to or involves an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States. *Williams v. Taylor*, 529 U.S. 362, 402-04 (2000). "A decision is 'contrary to' federal law when a state court applies a rule of law different from that set forth" in Supreme Court holdings or when it makes a contrary determination based on " 'materially indistinguishable facts.' " *Earp v. Ornoski*, 431 F.3d 1158, 1182 (9th Cir. 2005) (quoting *Williams*, 529 U.S. at 405-06). An "unreasonable application" occurs when the state court applies Supreme Court holdings to the facts of the petitioner's case in a manner that is "objec-

tively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409). "Clearly established federal law 'as determined by the Supreme Court, refers to the holdings, as opposed to the dicta of [the Supreme Court's] decisions as of the time of the relevant state-court decision.' " *Id.* (quoting *Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004) (internal citation omitted).

**[1]** In *Garceau v. Woodford*, 275 F.3d 769 (9th Cir. 2001), *rev'd on other grounds*, 538 U.S. 202 (2003), we acknowledged that the "Supreme Court has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith." *Id.* at 774. In fact, the Supreme Court reserved determination of this question in *Estelle v. MacGuire*, 502 U.S. 62 (1991). In *Estelle*, the defendant was accused of killing his infant daughter. *Id.* at 64. The prosecution introduced evidence that on prior occasions, the child suffered non-accidental injuries. *Id.* at 66. The evidence was intended to establish that the child suffered from "battered child syndrome" and that her ultimately fatal injuries were not accidental. *Id.* at 68. After the defendant was convicted and his appeals to the state court were denied, he sought habeas corpus relief. *Id.* at 66. He argued that the admission of the evidence of prior injuries violated the right to due process. *Id.* at 66-67. The Supreme Court held that the admission of the evidence did not rise to the level of a due process violation because "the prior injury evidence was relevant to an issue in the case." *Id.* at 70. The Court stated that "we need not explore further the apparent assumption of the Court of Appeals that it is a violation of the due process guaranteed by the Fourteenth Amendment for evidence that is not relevant to be received in a criminal trial." *Id.* Furthermore, the Court held there was no reasonable likelihood that the jury considered the evidence of prior injuries as propensity evidence. *Id.* at 74-75. It concluded: "[b]ecause we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime." *Id.* at 75 n.5.

Lacking any Supreme Court authority directly on point, Mr. Alberni relies exclusively on cases we decided prior to the enactment of AEDPA to support his contention that the propensity evidence offered in his case violated due process. *See, e.g.*, *Garceau*, 275 F.3d at 775; *Walters v. Maas*, 45 F.3d 1355, 1357 (9th Cir. 1995); *McKinney v. Rees*, 993 F.2d 1378, 1384 (9th Cir. 1993); *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991); *McGuire v. Estelle*, 902 F.2d 749 (9th Cir. 1990), *rev'd* 502 U.S. 62 (1991). However, when the Supreme Court has expressly reserved consideration of an issue, as it has here, the petitioner cannot rely on circuit authority to demonstrate that the right he or she seeks to vindicate is clearly established. *See Earp*, 431 F.3d at 1184-85. Circuit "precedent derived from an extension of a Supreme Court decision is not 'clearly established federal law as determined by the Supreme Court.' " *Id.* at 1182 (quoting *Duhaime v. Ducharme*, 200 F.3d 597, 602-03 (9th Cir. 2000)). "Circuit precedent is relevant only to the extent it clarifies what constitutes clearly established law." *Id.* "[P]ost-AEDPA[,] only Supreme Court holdings are binding on state courts." *Earp*, 431 F.3d at 1184 n.23.

Mr. Alberni argues that even though the Supreme Court has never explicitly held that the introduction of propensity evidence may violate due process, we may apply the "general governing principles to the case at hand." *Robinson v. Ignacio*, 360 F.3d 1044, 1056-57 (9th Cir. 2004). The Supreme Court has established a general principle that evidence that "is so extremely unfair that its admission violates fundamental conceptions of justice" may violate due process. *Dowling v. United States*, 493 U.S. 342, 352 (1989). Mr. Alberni argues that we can look to our own precedent to the extent it clarifies this general principle. *See Robinson*, 360 F.3d at 1057.

In *Robinson*, the trial court granted the defendant's request to represent himself at trial after extensive canvassing on the issue. 360 F.3d at 1048. After he was convicted, he sought to have counsel appointed for his sentencing hearing. *Id.* The

trial court denied his request, concluding that "[b]ased on the extensive canvass of the Court and contrary to my suggestions to [the defendant], he elected to represent himself in this proceeding." *Id.* The defendant argued in federal habeas corpus proceedings that this denial of counsel violated the Sixth Amendment. *Id.* at 1051. We concluded that "[a]lthough the Supreme Court has never explicitly addressed a criminal defendant's ability to re-assert his right to counsel for sentencing after a previous waiver of that right during trial, its silence on this particular issue need not prevent us from identifying and applying the general governing principles at hand." *Id.* at 1056-57; *see also Williams*, 529 U.S. at 407 ("[A] state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."). We stated in *Robinson* that the "Supreme Court's Sixth Amendment jurisprudence has long recognized that a criminal defendant's right to counsel is a fundamental component of our justice system." *Id.* at 1056. Furthermore, we noted, "whenever a defendant is denied counsel during sentencing, the Supreme Court has uniformly found constitutional error without any showing of prejudice." *Id.* (citing *United States v. Cronic*, 466 U.S. 648, 659 (1984); *Chapman v. California*, 386 U.S. 18, 23 & n.8 (1967)). After looking at the general principles articulated by the Supreme Court, we concluded: "[W]hen faced with a novel situation we may turn to our own precedent, as well as the decisions of other federal courts, in order to determine whether the state decision violates the general principles enunciated by the Supreme Court and is thus contrary to clearly established federal law." *Id.* at 1057.

We are mindful that every circuit, in cases decided prior to the enactment of AEDPA, has acknowledged, at least implicitly, that the improper introduction of evidence may violate due process if it renders a trial fundamentally unfair. *See Jer-*

*vis v. Hall*, 622 F.2d 19, 22 (1st Cir. 1980) ("[S]o long as a legitimate state purpose was served by the admission of prior-crime evidence, its admission was not subject to constitutional attack"); *Collins v. Scully*, 755 F.2d 16, 18 (2d Cir. 1985) ("In order to prevail on a claim that an evidentiary error deprived the defendant of due process under the Fourteenth Amendment he must show that the error was so pervasive as to have denied him a fundamentally fair trial.") (citing *United States v. Agurs*, 427 U.S. 97, 108 (1976)); *United States v. Banmiller*, 310 F.2d 720, 725 (3d Cir. 1962) (concluding that defendant's trial was rendered fundamentally unfair by introduction of prior record), *abrogated by Spencer v. Texas*, 385 U.S. 554 (1967); *Stockton v. Virginia*, 852 F.2d 740, 748 (4th Cir. 1988) ("[T]he admissibility of evidence is generally a matter of state law which does not properly concern a federal habeas court unless it impugns the fundamental fairness of the trial"); *Lucas v. Johnson*, 132 F.3d 1069, 1079 (5th Cir. 1998) ("Habeas relief is warranted [for erroneous admission of evidence] when the erroneous admission played a crucial, critical and highly significant role in the trial") (internal citations and alterations omitted); *Burton v. Renico*, 391 F.3d 764, 774 (6th Cir. 2004) ("For the admission of evidence to violate constitutional due process, it must be shown that admitting the evidence violates fundamental fairness . . .") (internal quotations omitted); *Pierson v. O'Leary*, 959 F.2d 1385 (7th Cir. 1992) (stating that the improper admission of evidence renders a trial fundamentally unfair if its prejudicial effect outweighs its probative value "such that its admission likely changed the outcome of the trial"), *abrogated on other grounds*, *Cabrera v. Hinsley*, 324 F.3d 527 (7th Cir. 2003); *Hobbs v. Lockhart*, 791 F.2d 125, 127 (8th Cir. 1986) (stating that questions regarding the admissibility of evidence are reviewable in a habeas corpus proceeding if "the asserted error . . . was so prejudicial as to deny due process"); *McKinney*, 993 F.2d at 1380 (concluding that use of character evidence to show propensity may violate due process); *Duvall v. Reynolds*, 139 F.3d 768, 787 (10th Cir. 1998) (stating that the erroneous admission of evidence that renders a trial fundamentally

unfair violates due process); *Dobbs v. Kemp*, 790 F.2d 1499, 1503 (11th Cir. 1986) (stating that evidentiary errors are grounds for granting a writ of habeas corpus when the trial is rendered fundamentally unfair). Given the unanimity of the Courts of Appeals regarding the question whether the introduction of propensity evidence could ever violate due process, and the corresponding unlikelihood the Supreme Court will ever resolve the question it reserved in *Estelle*,[1] Mr. Alberni's argument that this Court should apply general principles of due process articulated by the Supreme Court is somewhat attractive. The Supreme Court has articulated the general principle that a denial of due process is demonstrated if "the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions.' " *United States v. Lovasco*, 431 U.S. 783, 790 (1977) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). In applying this general principle, both our precedents and the precedents of our sister circuits have concluded that it could apply to the introduction of propensity evidence. Had the Nevada Supreme Court concluded that the introduction of propensity evidence could never violate due process, this holding would have been out of step with each Circuit's application of Supreme Court precedent.

---

[1]The Supreme Court has denied certiorari at least four times on the issue presented in this case and reserved in *Estelle*. *See, e.g.*, *Hawkins v. California*, 537 U.S. 1189 (2003) (petition for writ of certiorari to the California Court of Appeal, 98 Cal. App. 4th 1428 (2003), in which petitioner argued that evidence of prior misconduct violated due process, 2002 WL 32133733); *duPont v. Pennsylvania*, 530 U.S. 1231 (2000) (petition for writ of certiorari to the Superior Court of Pennsylvania, 730 A.2d 970 (1999), in which petitioner argued that the use of propensity evidence when defendant asserted insanity defense violated due process, 2000 WL 34014059); *Olivarez v. McKinney*, 510 U.S. 1020 (1993) (petition for writ of certiorari to the Ninth Circuit Court of Appeals, 993 F.2d 1378 (9th Cir. 1993), in which the question was whether the introduction of propensity evidence in a closely balanced case constituted a *per se* due process violation, 1993 WL 13076599); *Jacobsen v. Illinois*, 509 U.S. 923 (1993) (petition for writ of certiorari to the Appellate Court of Illinois, in which petitioner argued that Supreme Court should address the question it left open in *Estelle*, 1993 WL 13076858).

**[2]** Nevertheless, this case is distinguishable from *Robinson*. In this case, the Supreme Court expressly reserved consideration of the issue at hand in *Estelle*. In *Robinson*, the Supreme Court had not made such a reservation. *See Robinson*, 360 F.3d at 1056-57, 1056 n.6. The circumstances of this case are more like those present in *Earp*, in which we declined to declare a constitutional principle clearly established after the Supreme Court had expressly concluded the issue was an "open question." *Earp*, 431 F.3d at 1185. We held in *Earp* that "the advent of AEDPA forecloses the option of reversing a state court determination because it conflicts with circuit law." *Id.* We cannot conclude that the Nevada Supreme Court acted in an objectively unreasonable manner in concluding that the propensity evidence introduced against Mr. Alberni did not violate due process, given that *Estelle* expressly left this issue an "open question."

**[3]** The right Mr. Alberni asserts has not been clearly established by the Supreme Court, as required by AEDPA. The district court did not err in denying Mr. Alberni's petition on due process grounds.[2]

## II

Next we consider whether Mr. Alberni's right to conflict-free counsel was violated.

## A

Sean Flamm was a former client of James Buchanan, Mr. Alberni's trial counsel. Mr. Buchanan objected to cross-examining a former client.

---

[2]Mr. Alberni also claims his due process rights were violated on the theory that the prosecution engaged in misconduct by commenting on the propensity evidence. The prosecutor's comments on the evidence did not violate clearly established Supreme Court precedent.

Mr. Flamm's name first came up during the State's cross-examination of Mr. Alberni. The State asked:

Q Do you know a person by the name of Sean Flamm?

A Yes, sir.

Q Were you ever involved in an accident with Mr. Flamm?

A Yes, sir. As a matter of fact, they came to shoot me and Dennis McElroy saved my life that day.

Q Did you ever strike Mr. Flamm?

A Yes, sir, I did.

Q What did you strike him with?

A My hand.

Q There wasn't a gun involved in that incident?

A They had it and we took it from him. Dennis took it from him when the dude cocked it to shoot me. Dennis rushed him, took the gun, and took it.

Q Was that an incident over money?

A No.

Q Are you sure?

A Yes, sir.

On redirect, Mr. Alberni testified in detail concerning the events that led up to the altercation with Mr. Flamm. He testi-

fied that one evening, while he was staying in a hotel room, he gave Mr. Flamm a quarter ounce of drugs and a knife. Mr. Flamm left the hotel room and was subsequently searched by police. The police found the drugs. Mr. Alberni testified that Mr. Flamm told the police he had gotten the drugs from Mr. Alberni. Mr. Flamm returned to the hotel room a short time later, insisted that he be let in, and asked for money for gas. Mr. Alberni's girlfriend gave him a few dollars.

Immediately after Mr. Flamm left, the police arrived at Mr. Alberni's door. Mr. Alberni consented for the police to search the hotel room, and the police found drugs. Mr. Alberni was arrested. He testified that the police told him that Mr. Flamm had turned him in. Mr. Alberni agreed to assist the police with a controlled buy. He testified that he did not actually help the police as he promised.

Mr. Alberni began to tell his and Mr. Flamm's mutual acquaintances that Mr. Flamm was a "rat" and that Mr. Flamm had "snitched" on him. Mr. Flamm, hearing that Mr. Alberni was making these statements, threatened to fight with Mr. Alberni. Mr. Alberni responded, "Bring it on." Eventually Mr. Flamm and Mr. Alberni spoke on the phone and exchanged hostile words. Mr. Alberni testified:

> "He was telling me, "You piece of shit, you know, fuck you. What are you saying I'm a rat. You got some paperwork on me?" That's street talk, you got something to prove, something on paper. I don't have any paperwork. I'm not going to the cops. You ratted on somebody. That's why you are violent. He got a parole violator. He got out through some lawyer and I don't know, one thing led to another.

With goading from Mr. Alberni, Mr. Flamm came to the apartment where Mr. Alberni was staying. Mr. Flamm was accompanied by David Lum. Mr. Lum had a gun. According to Mr. Alberni, Mr. Flamm rushed through the door when Mr.

McElroy opened it. Mr. Flamm made threatening gestures and remarks. Mr. Alberni hit Mr. Flamm. Mr. McElroy grabbed the gun from Mr. Lum. Mr. McElroy hit and kicked Mr. Lum. Mr. Alberni hit him as well. Mr. Alberni testified that Mr. McElroy saved his life.

On recross examination by the prosecutor, the following exchange occurred:

> Q   Dennis isn't here to backup your story, is he?
>
> A   No, he ain't.
>
> Q   What happened to Dennis?
>
> A   He's dead.
>
> Q   Who shot him?
>
> A   Accidentally, me.
>
> Q   Who shot him?
>
> A   Me.

After the defense rested, the State called Mr. Flamm as a rebuttal witness. Mr. Flamm testified that he went to see Mr. Alberni because he owed Mr. Alberni approximately $300. Mr. Flamm had owed Mr. Alberni the money for some time and was not able to pay. He did not remember if anyone besides Mr. Alberni was at the apartment. Mr. Flamm explained:

> I walked in [the apartment] to confront him because he was telling some girl that he wanted to talk to me. I went up there to go talk to him and to see what was going on. He was turned around and when I went to go approach him, he turned around with the butt of

his gun and hit me right upside my eye right here. At that time I fell down and I don't remember what happened then.

Mr. Flamm denied making any offensive gestures to Mr. Alberni. He denied that Mr. Alberni had ever threatened him in connection with the debt.

Mr. Buchanan had previously represented Mr. Flamm on drug charges for which Mr. Flamm pled guilty and was placed on probation. He represented Mr. Flamm a second time in connection with his arrest at the motel after Mr. Alberni gave him drugs—the arrest about which Mr. Alberni testified. As a result of the arrest at the motel, Mr. Flamm's probation was modified to include boot camp. When Mr. Flamm failed to complete boot camp, his deferred sentence of imprisonment was imposed. By the time Mr. Flamm testified, he was on parole.

Mr. Buchanan refused to cross-examine Mr. Flamm, stating, "I won't ask him any questions. No questions." He explained: "I just don't wish to cross examine one of my clients. I will ask no questions."

The trial court began to question Mr. Flamm about Mr. Buchanan's representation of him. The court established that although Mr. Buchanan's representation of Mr. Flamm was not connected with the shooting of Mr. McElroy, it was connected with the altercation between Mr. Flamm and Mr. Alberni. The court did not ask Mr. Flamm for details regarding how the two matters were related.

The trial court then sought a waiver of the conflict from Mr. Flamm, but not Mr. Alberni. The court asked Mr. Flamm: "So you waive any conflict of interest that you might have by virtue of him representing both Mr. Alberni on this case and yourself in the matter for which you stand on probation?" To this Mr. Flamm responded: "None."

Although the court insisted that Mr. Flamm had "waived his right to have [Mr. Buchanan] maintain his confidence," the court never explicitly asked Mr. Flamm for a waiver of attorney-client confidentiality or explained to him the nature of the right he was supposedly waiving. Instead, the court asked him: "Do you have any objection to Mr. Buchanan cross examining you about this incident at this point?" and "you don't care whether [defense counsel] asks the question; is that correct?" After Mr. Buchanan insisted that a conflict of interest had arisen because Mr. Alberni had referred to Mr. Buchanan in his testimony when he spoke of a lawyer getting Mr. Flamm out of jail, the court stated, "He holds the privilege. He waives it; is that correct?" To which Mr. Flamm volunteered, "Whatever. Whatever needs to be asked. I mean let it be asked."

Mr. Buchanan protested: "I don't know whether a client can waive an ethical breach of a confidential relationship." The trial court responded that there was "no ethics involved once he waived the conflict and his right to have you retain his confidence." The court stated, "as a matter of law, in my opinion, and I hereby absolve you of any possible conflict of interest and the issue that is before the Court, the Court, as a matter of law, rules that you have no ethical issue with cross examining the witness because he has waived his right to have you maintain his confidence." Mr. Buchanan responded, "All right. I'll accept that."

Mr. Buchanan proceeded to cross-examine Mr. Flamm. He did not impeach Mr. Flamm with his prior felony conviction. He did not impeach Mr. Flamm based on the fact that he violated his probation when he accepted drugs from Mr. Alberni. He did not impeach Mr. Flamm with the inconsistencies in his testimony. He did not impeach Mr. Flamm by pointing out the inconsistencies between his and Mr. Alberni's testimony. Although he did ask him whether he had heard Mr. Alberni had called him a rat, he did not press Mr. Flamm on whether he was angered by that. He did not question Mr. Flamm

regarding who started the altercation. He did not press Mr. Flamm when he contended he did not remember Mr. McElroy being present. He did not ask Mr. Flamm about Mr. Alberni's claim that he hit him with his hand, not with a gun. Regarding Mr. Flamm's claim that he went to see Mr. Alberni because he owed him money, the following exchange occurred:

Q    You went there with the express intent of confronting Mr. Alberni in regard to things he was saying about you?

A    No, because I owed him money.

Q    Okay. Well—

A    We went there to talk about money.

Q    Well, if you owe somebody money, you don't go look somebody up, do you?

A    When it comes to him, yeah.

Mr. Buchanan:    Nothing further.

The cross-examination took up only three pages of transcript.

Mr. Alberni contended on direct appeal in state court that the cross-examination violated his Sixth Amendment right to conflict-free counsel. The Nevada Supreme Court concluded that no conflict existed, and to the extent one did exist, the trial court's questioning alleviated it. The district court concluded in the § 2254 proceedings that "the jury had already been informed that Flamm had been involved in selling drugs with Alberni; thus, the defense stood to gain little by asking Flamm about his felony drug conviction." Accordingly, the district court held that Mr. Buchanan's performance was not adversely affected by the conflict.

## B

**[4]** "The Sixth Amendment right to counsel includes a correlative right to representation free from conflicts of interest." *Lewis v. Mayle*, 391 F.3d 989, 995 (9th Cir. 2004). To establish a violation of the right to conflict-free counsel, the petitioner must show either that (1) in spite of an objection, the trial court failed to allow him the "opportunity to show that potential conflicts impermissibly imperil his right to a fair trial;" or (2) that an actual conflict of interest existed. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).

**[5]** In several cases in which the Supreme Court has defined the right to conflict-free counsel, the defense attorney actively and concurrently represented conflicting interests. *Mickens v. Taylor*, 535 U.S. 162, 166-167 (2002) (discussing earlier authority); *see also Holloway v. Arkansas*, 435 U.S. 475 (1978) (attorney representing co-defendants); *Cuyler*, 446 U.S. at 337-38 (same). In those cases, the Court created, in effect, a distinction between an actual conflict of interest, and a mere hypothetical one. It pointed out that dual representation by an attorney does not *per se* create a conflict of interest. Indeed, in many situations, dual representation may work in the defendant's favor. *Holloway*, 435 U.S. at 482; *Cuyler*, 446 U.S. at 348. Nevertheless, the Court concluded that "joint representation of conflicting interests is suspect" because of the effect it may have on counsel's performance. *Holloway*, 435 U.S. at 489-490. Accordingly, the Sixth Amendment does not protect against a "mere theoretical division of loyalties." *Mickens*, 535 U.S. at 171. Rather, it protects against conflicts of interest that adversely affect counsel's performance. *Id.* at 172 n.5. Indeed, in *Mickens*, the Court held that "actual conflict" is defined by the effect a potential conflict had on counsel's performance. In *Mickens*, the Court explained, "[A]n actual conflict of interest [means] precisely a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties." *Id.* at 171; *see also id.* at 172 n.5

("[W]e have used 'conflict of interest' to mean a division of loyalties *that affected counsel's performance*.").

**[6]** When counsel objects to potentially conflicted representation, the trial court has an opportunity to eliminate the possibility of an impact on counsel's performance through seeking a waiver from the defendant, appointing separate counsel, or taking adequate "steps to ascertain whether the risk [is] too remote to warrant separate counsel." *Holloway*, 435 U.S. at 484; *Mickens*, 535 U.S. at 173. If the trial court fails to make such an inquiry into the potential conflict, reversal is automatic. *Holloway*, 435 U.S. at 488. The Court has reasoned that in such a case, prejudice should be presumed. It has stated:

> [T]his Court has concluded that the assistance of counsel is among those 'constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.' Accordingly, when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic.
>
> That an attorney representing multiple defendants with conflicting interests is physically present at pretrial proceedings, during trial, and at sentencing does not warrant departure from this general rule. Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing.

*Id.* at 489-90 (internal citations omitted).

The State argues that the trial court's questioning of Mr. Flamm eliminated the potential for conflict because Mr. Flamm waived his attorney-client privilege. The State's argument supposes that after a hypothetical division of loyalties is

eliminated, no actual conflict of interest will arise. There is some support for this proposition. In *United States v. Partin*, 601 F.2d 1000 (9th Cir. 1979), we held that no conflict arose when the witness waived his attorney-client privilege. In that case, counsel objected to cross-examining his client because of the attorney-client privilege. This Court stated, "Once [the witness] waived his attorney-client privilege the conflict which concerned [counsel] was eliminated. The privilege was not [counsel's] but [the witness's]." *Id.* at 1009; *see also United States v. Jeffers*, 520 F.2d 1256, 1265 (7th Cir. 1975) (concluding that a waiver of attorney-client privilege may have alleviated counsel's concern that he possessed confidential information concerning a witness).

**[7]** However, this authority does not guide our inquiry under these circumstances. Rather, we are bound to consider Supreme Court precedent, which holds that an actual conflict is defined by its effect on counsel, not by whether there is a "mere theoretical division of loyalties." *Mickens*, 535 U.S. at 171, 172 n.5. A court is not required to inquire "into actual conflict as something separate and apart from adverse affect." *Id.* at 172 n.5. Here, the trial court's questioning of Mr. Flamm, may have, from a hypothetical perspective, eliminated Mr. Buchanan's conflict. It did not necessarily eliminate the impact the conflict had on Mr. Buchanan's performance. In *Holloway*, the Court concluded that a trial court's questioning could eliminate a conflict. However, the conflict could be eliminated because the questioning would result in the appointment of new counsel or the conclusion that "the risk [of conflict] was too remote to warrant separate counsel." *Holloway*, 435 U.S. at 484. The Court did not assume that once counsel claimed his performance would be adversely affected, the trial court could somehow erase the attorney's concerns through seeking waivers of the attorney's ethical duties. The trial court in this case did not expressly find that the risk was remote that Mr. Buchanan's performance would be affected. It hardly inquired into the nature of Mr. Buchanan's concerns. In the questions posed to Mr. Flamm, the trial

court focused on whether the witness was willing to waive the impact of the conflict of interest. It did not question Mr. Alberni about the alleged conflict and its possible adverse impact on Mr. Buchanan's defending Mr. Alberni.

[8] In *Partin*, after concluding that the waiver of attorney-client privilege had eliminated the potential for an adverse effect on counsel's performance, the court went on to consider whether counsel's performance was in fact adversely affected. *Partin*, 601 F.2d at 1009. The implication is that the trial court's theoretical elimination of the conflict would not be sufficient in the face of an actual adverse impact on the defendant. In this case, even if the waiver the trial court sought of Mr. Flamm's attorney-client privilege was valid, if Mr. Buchanan's performance was adversely affected, a conflict existed. The Nevada Supreme Court's conclusion that "any potential conflict of interest was sufficiently mitigated by questions the district court posed to the witness" is therefore contrary to clearly established federal law.

We are nevertheless unconvinced by Mr. Alberni's argument that because he objected to the cross-examination of Mr. Flamm and the trial court's inquiry was insufficient, no further showing of an actual conflict is needed. In *Holloway*, it was unnecessary for the defendant to demonstrate an actual conflict because the attorney repeatedly contended on that record that his representation was adversely affected. *Holloway*, 435 U.S. at 484. The Court deferred to the attorney's judgment about his own representation. *Id.* at 485. In this case, Mr. Buchanan stated that he would "accept" the trial court's "absolution" from his asserted conflict of interest. Beyond that, there is no record to demonstrate that Mr. Buchanan continued to consider himself constrained.

It is therefore necessary for Mr. Alberni to demonstrate that an actual conflict of interest existed. That is, he must show that Mr. Buchanan's performance was adversely affected. It is not clear from its opinion that the Nevada Supreme Court

based its holding that there was no actual conflict of interest solely on the fact that Mr. Buchanan no longer represented Mr. Flamm, and therefore was not "actively representing conflicting interests." *See, e.g.*, *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended by* 253 F.3d 1150 (9th Cir. 2001) (concluding that to show an actual conflict a petitioner must show that counsel actively represented conflicting interests). Such a holding would be unreasonable in light of clearly established federal law. It is clearly established by Supreme Court precedent that "successive representation" may pose an actual conflict of interest because it may have an adverse affect on counsel's performance. *See Mickens*, 535 U.S. at 175-176 (declining to decide whether when an attorney is constrained by successive representation, only an adverse affect on the attorney's performance must be shown or whether prejudice must be shown in order to obtain relief, but not questioning that successive conflicts may pose Sixth Amendment difficulties); *see also Lewis*, 391 F.3d at 989 (applying Sixth Amendment analysis to question of successive representation); *Jeffers*, 520 F.2d at 1265, 1265 n.14 (discussing conflicts of interest based on the prior representation of a prosecution witness by defense counsel and citing cases from the 5th, 1st, 2d, and 3d Circuits recognizing the potential for such conflicts).

**[9]** The present record is insufficient to determine whether an actual conflict of interest existed. Mr. Buchanan failed to impeach Mr. Flamm with his prior conviction, his probation status, and on multiple points of his testimony. These omissions appear to be critical in light of the impact they could have on the jury's perception of Mr. Alberni's credibility and his propensity for violence. Mr. Flamm was called as a rebuttal witness to impeach Mr. Alberni. When the only evidence supporting Mr. Alberni's claim that the shooting was accidental was his own testimony, it was critical that the jury find him credible. However, the failure to question Mr. Flamm regarding his prior conviction, his probation status, and his inconsistent testimony is not necessarily attributable to a con-

flict. A link between deficient performance and the conflict of interest must be shown. *See Lewis*, 391 F.3d at 998-999 (considering link between counsel's omissions in cross-examination and conflict); *Lockhart v. Terhune*, 250 F.3d 1223, 1231 (9th Cir. 2001) (requiring petitioner to show "that the attorney's behavior seems to have been influenced by the conflict"). The district court did not conduct an evidentiary hearing. Thus, Mr. Buchanan has not been interrogated concerning his failure to impeach Mr. Flamm regarding his criminal record and his inconsistent testimony. Although Mr. Buchanan's testimony on this matter would not be conclusive, *Sanders v. Ratelle*, 21 F.3d 1446, 1452 (9th Cir. 1994), there may be legitimate tactical reasons for Mr. Buchanan's decision not to impeach Mr. Flamm on these matters. We will not speculate about his cross-examination strategy. *See Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir. 2001) (refusing to speculate regarding whether the attorney's conflict was the "cause of any inactions" on the part of the attorney and stating that the attorney "may have had valid tactical reasons"); *Mickens*, 535 U.S. at 177 (O'Connor, J., concurring) ("[O]ur role is not to speculate about counsel's motives or about the plausibility of other litigation strategies."). However, without Mr. Buchanan's testimony, we cannot reach a satisfactory resolution of the question whether Mr. Buchanan's prior representation of Mr. Flamm adversely affected his defense of Mr. Alberni.

**[10]** We conclude that an evidentiary hearing is necessary to resolve this issue. A petitioner is entitled to an evidentiary hearing if he (1) alleges facts, which, if proven, would entitle him to relief; and (2) show that he did not receive a full and fair hearing in state court either at trial or in a collateral proceeding. *Karis v. Calderon*, 283 F.3d 1117, 1126-27 (9th Cir. 2002). Mr. Alberni has alleged that Mr. Buchanan only grudgingly accepted the trial court's "absolution" from his conflict of interest, and that due to the conflict, he failed to impeach Mr. Flamm on several key points. If these allegations are true,

Mr. Alberni is entitled to relief. However, the record is not sufficient to determine if these allegations are true.

Mr. Alberni did not receive a full and fair hearing on this question in state court. The conflict was presented to the Nevada Supreme Court on direct appeal. Accordingly, the Nevada Supreme Court was limited to a review of the trial record. It did not have the benefit of Mr. Buchanan's testimony regarding the tactical reasons, if any, behind his limited cross-examination. Its conclusion that there was no actual conflict of interest rested on an incomplete record.

Mr. Alberni's postconviction petition was denied without an evidentiary hearing. The Nevada District Court reasoned that no hearing was necessary because the claim of a conflict was a "naked allegation." On appeal from the decision of the Nevada District Court, the Nevada Supreme Court did not address the denial of an evidentiary hearing. In his state post-conviction proceedings, Mr. Alberni requested appointment of counsel to represent him. His request was denied. Because Mr. Alberni sought counsel and it was denied, he has not neglected his rights. *See Bragg*, 242 F.3d at 1090 (stating that a federal court may not hold an evidentiary hearing if the petitioner neglected his rights in state court).

Should the evidentiary hearing demonstrate that Mr. Buchanan's performance was adversely affected, the question remains whether prejudice will be presumed, or whether Mr. Alberni must demonstrate, under *Strickland v. Washington*, 466 U.S. 668, 694 (1984), a probable impact on the result of his trial. The Nevada Supreme Court concluded that in this case, had an actual conflict of interest been shown, prejudice would be presumed. The question whether prejudice must be shown in cases of successive representation is one that the Supreme Court specifically left open in *Mickens*. *See Mickens*, 535 U.S. at 176 ("Whether [*Cuyler*] should be extended to [cases of successive representation] remains, as far as the jurisprudence of this Court is concerned, an open question.").

In *Mickens*, the Court concluded that in cases of concurrent conflicts, only an adverse effect on the attorney's performance must be shown in order to obtain relief. In other words, after an actual conflict is demonstrated, relief must be afforded regardless of prejudice. However, the Court implied that in cases of successive conflicts, the more stringent *Strickland* prejudice standard may be applied. In addition to showing an actual conflict, that is an adverse effect on the attorney's performance, the petitioner may be required to show prejudice. The Court reasoned that with successive conflicts, there is less potential for a conflict to prejudice the defendant, and so the court need not necessarily engage in the same presumption of prejudice. *Id.*

**[11]** In *Lewis*, a case we decided after AEDPA was enacted, we concluded that an attorney's former representation of a prosecution witness resulted in an actual conflict of interest that impacted his representation. *Lewis*, 391 F.3d at 997-1000. We applied the more permissive standard that only an adverse effect on the attorney's performance, and not prejudice, needed to be shown to establish a Sixth Amendment violation. *Id.* at 997. After concluding that an actual conflict of interest had been shown, we remanded the case to the district court with instructions that the habeas petition be granted. We did not require the petitioner to show prejudice. *Id.* at 999-1000. Because the Supreme Court left open the question whether prejudice needed to be shown, and consistent with our holding, we hold that the Nevada Supreme Court's conclusion that prejudice could be presumed was not contrary to clearly established federal law as determined by the Supreme Court.

## CONCLUSION

We vacate the decision of the district court regarding the conflict of interest claim with instructions that an evidentiary hearing be conducted on the question whether "some effect on counsel's handling of particular aspects of the trial was like-

ly" due to the potential conflict. *See Lockhart*, 250 F.3d at 1231 (articulating standard for adverse effect). Should the district court conclude that an actual conflict of interest existed, Mr. Alberni need not show prejudice. We affirm the district court's ruling that the Nevada Supreme Court's conclusion that Mr. Alberni's due process rights were not violated by the introduction of character evidence is not objectively unreasonable.

**AFFIRMED IN PART; VACATED AND REMANDED IN PART**.

---

McKEOWN, Circuit Judge, concurring in part and dissenting in part:

I concur in Part I of the opinion. I write separately because it is important to underscore that the Supreme Court's decision to pass on a question, even expressly, is not automatically the death knell for habeas relief. I dissent as to Part II because the attorney conflict issue here involves successive representation and Alberni is required to establish prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984). The majority relieves him of this burden, an approach—as explained in *Mickens v. Taylor*, 535 U.S. 162, 174-75 (2002) —that has not been established by Supreme Court precedent.

## I.   AEDPA RELIEF MAY BE AVAILABLE FOR RESERVED ISSUES

I concur in Part I of the opinion, with the understanding that the Supreme Court's reservation of a specific question, expressly or otherwise, does not, in itself, preclude habeas review under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. In these situations, federal courts may still test the state court decision against clearly established underlying constitutional princi-

ples, as laid out by the Supreme Court. *Ferrizz v. Giurbino*, 432 F.3d 990, 993 (9th Cir. 2005).

The footnote found in *Estelle v. McGuire* as to reservation of the propensity evidence question does not preclude AEDPA review; instead, it simply points out that nothing in *Estelle* is intended to resolve that issue: We "express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime" because we "need not reach the issue" to decide the case. 502 U.S. 62, 75 n.5 (1991); *see also Ferrizz*, 432 F.3d at 993 (holding a similar type footnote did not preclude AEDPA review).

The question then is whether the Supreme Court has " 'broken sufficient legal ground to establish [the] asked-for constitutional principle, [because] the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar.' " *Ferrizz*, 432 F.3d at 993 94 (quoting *Williams v. Taylor*, 529 U.S. 362, 381 (2000)). The Supreme Court has not spoken directly on whether propensity evidence violates the Constitution's guarantee of due process found in the Fourteenth Amendment. Significantly, the current reach of due process for propensity evidence does not extend past the generic and very narrow standard of "fundamental fairness" or "fundamental conceptions of justice," *Dowling v. United States*, 493 U.S. 342, 352-53 (1990), which, for the purposes of AEDPA's clearly established federal law requirement, is barely one step removed from the Constitution's recitation of due process itself. The scant supply of Supreme Court precedent applicable to the propensity evidence issue does not, in my opinion, provide sufficient "clearly established Federal law, as determined by the Supreme Court of the United States" under § 2254(d)(1).

Given the current posture of Supreme Court precedent, I concur that the Nevada Supreme Court did not violate AEDPA in deciding this claim. Although the most general

standard of due process is not sufficient to meet the clearly established federal law requirement for propensity evidence, we must be mindful that when there is applicable and clearly established federal law in Supreme Court precedent, it should be applied on habeas review, even if the Supreme Court expressly declined to decide the specific issue. *Robinson v. Ignacio*, 360 F.3d 1044, 1057 (9th Cir. 2004) (" 'rules of law may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright-line rule' ") (quoting *Williams*, 529 U.S. at 382). The proverbial "take a pass" footnote alone should not prevent AEDPA review.

## II. *STRICKLAND* PREJUDICE IS REQUIRED FOR A SUCCESSIVE REPRESENTATION CLAIM

I respectfully dissent as to Part II of the opinion. The majority, relying on state court and circuit precedent, improperly relieves Alberni's burden to show *Strickland* prejudice for his Sixth Amendment successive representation claim. *Strickland* remains the binding precedent for successive representation claims, and no clearly established Supreme Court precedent has imported a presumption of prejudice. *Mickens*, 535 U.S. at 174-75. By reversing the state court and granting relief in violation of *Strickland*, the majority's view is contrary to clear Supreme Court precedent and AEDPA—the federal courts "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a state court *only on the ground* that he is in custody in violation of the Constitution or laws or treaties of the United States," § 2254(a) (emphasis added), and the basis of the claim must be grounded upon "clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1); *see Williams*, 529 U.S. at 405-06 (using the "clearly established precedent" of *Strickland* to illustrate the point that the governing Supreme Court law must be identified as a prerequisite for AEDPA review).

In *Strickland*, the Supreme Court established that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. . . . [A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." 466 U.S. at 691-92 (citations omitted). Citing *Cuyler v. Sullivan*, 446 U.S. 335, 345-50 (1980), a concurrent representation case decided four years earlier, the Court recognized that certain attorney conflicts may give rise to a presumption of prejudice—the so-called *Sullivan* prophylaxis— but "[p]rejudice is presumed *only if* the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " *Strickland*, 466 U.S. at 692 (quoting *Sullivan*, 446 U.S. at 350) (emphasis added). The Supreme Court was clear: it is only in concurrent representation cases (i.e., active representation of conflicting interests) that the *Sullivan* prophylaxis applies.

The question, then, is whether any Supreme Court precedent supports an extension of *Sullivan* outside concurrent representation into successive representation. In the time between *Strickland* and the Nevada Supreme Court's decision, the United States Supreme Court did not indicate a move from the confines of *Strickland*. And then, just a few years ago, the Court made it abundantly clear in *Mickens* that a presumption of prejudice is completely unsupported in successive representation cases. In *Mickens*, the Court chastised the Courts of Appeals that had improperly presumed prejudice in a variety of attorney conflict situations outside the concurrent representation context, including cases involving "counsel's obligations to *former* clients." 535 U.S. at 174. Such a presumption is incorrect and unreasonable, according to *Mickens*, because Supreme Court precedent "does not clearly establish, *or indeed even support*, such expansive application" of the *Sullivan* prophylaxis outside concurrent representation. *Id.* at 175 (emphasis added). This statement is far more definitive than

the Supreme Court's often ambiguous "open question" approach. *Compare Estelle*, 502 U.S. at 75 n.5 ("Because we need not reach the issue, we express no opinion . . . ."). *Mickens* is more akin to "the question is decided and closed until further notice."

Put another way, *Mickens* pointedly counsels that a state court conviction may not be reversed on federal habeas review upon a mere showing of an actual conflict in a *successive representation* case—*Strickland* prejudice is and has always been required by the Supreme Court regardless of what circuit or state court precedent might say. *See Earp v. Ornoski*, 431 F.3d 1158, 1184-85 (9th Cir. 2005) (affirming state court decision because there was no clearly established federal law relieving the prejudice requirement of *Strickland*). Thus, Alberni must show " 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Mickens*, 535 U.S. at 166 (quoting *Strickland*, 466 U.S. at 694); *accord Earp*, 431 F.3d at 1184-85.

From the record and Nevada Supreme Court opinion, it is readily apparent that this case involves defense counsel's past or former representation of a witness. The same counsel's representation of Alberni at a later date is deemed a successive representation. Two questions are thus presented: whether there was an actual conflict and whether Alberni was prejudiced from the conflict. But even if there were an actual conflict, absent prejudice, Alberni's claim fails. *See Strickland*, 466 U.S. at 695 ("When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."); *Allen v. Woodford*, 395 F.3d 979, 999 (9th Cir. 2005) ("[E]ven if counsel's conduct was arguably deficient, in light of the overwhelming evidence of guilt, [petitioner] cannot establish prejudice.").

The question of prejudice may be easily resolved on this record. Significantly, the Nevada Supreme Court held that

there was overwhelming evidence of Alberni's guilt, and that this overwhelming evidence rendered harmless propensity evidence of violence admitted against Alberni. The court's finding is not unreasonable and a review of the record supports the same conclusion for the alleged conflict. Consequently, even if there were deficient performance by Alberni's counsel, it was harmless error because, in light of the overwhelming evidence of guilt, there was no reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

Instead of acknowledging the lack of prejudice, the majority proposes to remand for a hearing on the conflict. To what avail? If there is a conflict, then Alberni will still be required to demonstrate prejudice; it cannot be presumed. If he cannot establish prejudice, what is the point of a remand? Apparently the majority mistakenly believes that prejudice may be presumed. In doing so, the majority improperly relies on the state court decision and circuit precedent.

The Nevada Supreme Court denied Alberni's successive representation claim under the Sixth Amendment on the ground that Alberni did not establish an actual conflict. In doing so, the Nevada court presumed prejudice from the alleged conflict. Relying on state law, the Nevada Supreme Court quoted its case *Clark v. State*, 831 P.2d 1374, 1376 (Nev. 1992), for the proposition that "[a]n actual conflict of interest which adversely affects a lawyer's performance will result in a presumption of prejudice to the defendant." However, a review of *Clark* reveals that the circumstances involved a conflict of interest arising out of concurrent representation, not successive representation.

Even though this presumption is at odds with *Strickland*, we may affirm a habeas denial on any ground supported by the record, even if the reasoning differs from that of the lower court. *Garcia v. Burnell*, 33 F.3d 1193, 1195 (9th Cir. 1994) (§ 2254 AEDPA case where the appellate court affirmed the

denial of a Sixth Amendment conflict-free representation claim on grounds different than that offered by the district court); *see also Cooperwood v. Cambra*, 245 F.3d 1042, 1046 (9th Cir. 2001) (holding that "when a state court employs the wrong legal standard, the AEDPA rule of deference does not apply"); *Hinman v. McCarthy*, 676 F.2d 343, 349 (9th Cir. 1982) ("It is not the [state law] which is our measuring rod in habeas corpus proceedings, but the federal Constitution. Our task is to determine whether [the petitioner's] federal constitutional rights have been violated.") (citing § 2254(a)). The ground for affirming the state court's denial here is that Alberni does not attempt to show *Strickland* prejudice; neither does the record support such a finding.

The majority seizes upon the state court's ill-advised presumption, reasoning that "[t]he question whether prejudice must be shown in cases of successive representation is one that the Supreme Court specifically left open in *Mickens*." Majority Op. at 9191. Contrary to the majority's reasoning, for AEDPA purposes, *Strickland* prejudice is not an "open question" in successive representation cases. The Supreme Court unambiguously advised that its precedent does not support such an application. *Mickens*, 535 U.S. at 174-75.

The majority further errs by relying on circuit court precedent to circumvent the *Strickland* prejudice requirement, pointing to *Lewis v. Mayle*—a Ninth Circuit post-AEDPA successive representation case—where the court stated, without discussion, that if a petitioner can show " 'an actual conflict of interest [that] adversely affected his lawyer's performance'. . . . [he] need not show prejudice to the outcome of the trial." 391 F.3d 989, 997 (9th Cir. 2004) (quoting *Sullivan*, 446 U.S. at 348). This passing statement in *Lewis* was not necessary to its holding, which was limited to granting the habeas petition based on the state court's unreasonable determination that there was no actual conflict. *Id.* More importantly, however, in AEDPA terms, this statement standing alone is simply wrong. *Mickens*, 535 U.S. at 174-75.

We may not reverse the Nevada Supreme Court's decision under reasoning that violates the Supreme Court's dictate. *See Cooperwood*, 245 F.3d at 1046. We test the state court decision only against United States Supreme Court precedent, and then grant relief only if the decision is contrary to or an unreasonable application of that precedent.[1] *Williams*, 529 U.S. at 412. "We have always held that federal courts, even on habeas, have an independent obligation to say what the law is," *id.* at 411 (internal quotations marks omitted), and the law is *Strickland* according to the Supreme Court.

Contrary to controlling Supreme Court precedent, the majority incorrectly adopts a presumption of prejudice in a successive representation case, citing the Nevada Supreme Court and circuit precedent. *See* § 2254(a) & (d)(1). I would not order an evidentiary hearing because even if there were an actual conflict from the successive representation, it would be harmless in light of the overwhelming evidence of Alberni's guilt and the absence of *Strickland* prejudice. I would therefore affirm the state court's denial of Alberni's Sixth Amendment claim.

---

[1]Circuit precedent is, of course, helpful in our determinations under AEDPA, but it is not binding on the states. *See Earp*, 431 F.3d at 1182 ("Circuit court precedent is relevant only to the extent that it clarifies what constitutes clearly established law.").