**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANTHONY THOMAS FERRIZZ,
            *Petitioner-Appellant,*

v.

G. J. GIURBINO,
            *Respondent-Appellee.*

No. 03-56137

D.C. No.
CV-02-05837-GLT

OPINION

Appeal from the United States District Court
for the Central District of California
Gary L. Taylor, District Judge, Presiding

Argued and Submitted
February 7, 2005—Pasadena, California

Filed December 23, 2005

Before: Harry Pregerson, William C. Canby, Jr., and
Robert R. Beezer, Circuit Judges.

Opinion by Judge Canby

**COUNSEL**

Kenneth M. Stern, Woodland Hills, California, for the petitioner-appellant.

Timothy M. Weiner, Deputy Attorney General, Los Angeles, California, for the respondent-appellee.

**OPINION**

CANBY, Circuit Judge

Anthony Ferrizz appeals the district court's denial of his habeas corpus petition, brought pursuant to 28 U.S.C. § 2254. Ferrizz contends that his state convictions violate due process because the jury's guilty verdicts on two counts of the charges — burglary and grand theft of lost property — are factually inconsistent. We conclude that, in the circumstances of this

case, the decision of the California Court of Appeal upholding both verdicts was not "contrary to, or . . . an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). We therefore affirm the judgment of the district court.

## I

The facts are uncontested. Ferrizz and Manual Escobedo worked in roofing. In March of 2000, Holly Cirivello, the victim, called them for a roof repair. When they arrived in the morning, she took them into her master bedroom to show them where water was leaking into her room from the roof. On the wall of the bedroom, Cirivello had hung two antique purses, one of which contained an expensive wedding ring. After pointing out the leaks, Cirivello led the two men out of her house. They told her that they would return later in the day to repair the roof. Cirivello then left the house, locking all the doors.

When Ferrizz and Escobedo returned, Escobedo primarily worked on the roof while Ferrizz assisted both on the ground and on the roof. For the most part, Ferrizz did not leave Escobedo's sight for more than a minute or two. At one point, however, Ferrizz was out of sight for slightly longer.

When Cirivello returned to her house that evening, Ferrizz and Escobedo were gone, having finished the repairs earlier that day. She noticed a muddy heel print next to her office sofa. (It had begun raining only after Cirivello left her house in the morning.) Approximately a week later, she also noticed that the window behind the sofa was unlocked, and she noticed dried leaves behind the sofa. She always kept this window locked.

Shortly thereafter, she discovered that her wedding ring was missing from the purse on the wall of her master bed-

room. She also noticed two palm prints on the unlocked window. She had not had any visitors other than Ferrizz and Escobedo between the time she had placed her ring in the purse and the time she discovered it missing. At this point, Cirivello called the sheriff's department to report her ring missing.

Meanwhile, three days before Cirivello reported the ring missing, Ferrizz had gone to an antique mall in Santa Maria, California, to sell the wedding ring. He sold the ring to Judy Jildera, a jeweler, for $300.00, telling her that he had found the ring inside a wall of a demolished home.

Sheriff's officers subsequently called Ferrizz and asked him about the ring. He stated that he had found a diamond ring outside of Cirivello's master bedroom window. After the call, Ferrizz came to Cirivello's house and told Cirivello that he did not have the ring but would try to find it. Thereafter he made several attempts to repurchase the ring from Jildera, who was reluctant to sell it back to Ferrizz.[1] Ferrizz finally arranged a meeting with Jildera to repurchase the ring from her. Her husband notified the police of the meeting, however. At the meeting, Jildera told Ferrizz that they must wait for the police to arrive, to which Ferrizz responded "oh no, [t]his is my third strike."

## II

The jury found Ferrizz guilty of four crimes: (1) burglary, CAL. PENAL CODE § 459; (2) grand theft of personal property, CAL. PENAL CODE § 487; (3) grand theft of lost property, CAL. PENAL CODE § 485; and (4) receiving stolen property, CAL. PENAL CODE § 496(a). The trial judge granted Ferrizz's motion for a new trial on count four, receiving stolen property,[2] but denied a new trial on the other counts.[3]

---

[1] The ring appraised at a retail value of $2,890.00.

[2] The State indicated an intent not to retry Ferrizz for receiving stolen property, and that count was dismissed.

[3] Ferrizz represented himself at trial.

The trial judge sentenced Ferrizz to thirty-five years to life on count one (burglary).[4] The trial judge consolidated counts two (grand theft), and three (grand theft of lost property) into a single grand theft conviction, because he concluded that, with regard to those counts, "only one crime [was] committed." On the consolidated counts, the judge sentenced Ferrizz to twenty-five years to life, and then stayed the imposition of that portion of the sentence. The greater sentence on count one remained in force.

The California Court of Appeal affirmed in an unpublished opinion. Ferrizz contended that the verdicts could not stand because they were factually inconsistent: the conviction on count three indicated that the jury was convinced that Ferrizz had found the ring and improperly kept it, while the conviction on count one indicated that the jury thought he had burglarized Cirivello's home to take the ring. The Court of Appeal held that inconsistent verdicts were allowed to stand, and affirmed the convictions and sentence. The Supreme Court of California denied review.

Ferrizz filed a petition for habeas corpus. The district court denied relief, but granted Ferrizz a certificate of appealability on the question whether "the state courts acted contrary to Federal law, as determined by the Supreme Court, or unreasonably applied the law, in denying Ferrizz's claim that his due process rights were violated because his guilty verdicts were logically inconsistent with one another."

## III

We review de novo the district court's denial of a habeas petition. *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003). The Antiterrorism and Effective Death Penalty Act ("AEDPA") limits review, however. *See id.* We may not grant

---

[4]This sentence was imposed under California's "three strikes" law. *See* Cal. Penal Code § 667(e)(2)(A).

a habeas petition unless the state court's decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## IV

[1] The Supreme Court has made it clear that inconsistent verdicts may stand when one of those verdicts is a conviction and the other an acquittal. *See United States v. Powell*, 469 U.S. 57, 65 (1984); *Dunn v. United States*, 284 U.S. 390, 393 (1932). The underlying rationale of these cases is that the acquittal on one count may be explained as an exercise of lenity by the jury that is not necessarily grounded in its view of the evidence. *See Dunn*, 284 U.S. at 393. In adhering to this rule in *Powell*, however, the Court noted:

> Nothing in this opinion is intended to decide the proper resolution of a situation where a defendant is convicted of two crimes, where a guilty verdict on one count logically excludes a finding of guilt on the other.

*Powell*, 469 U.S. at 69 n.8. The government contends that this footnote establishes that the question of the effect of inconsistent guilty verdicts is an open one in the Supreme Court, and therefore there can be no "clearly established Federal law, as determined by the Supreme Court" on this issue to permit habeas relief under § 2254(d)(1).[5]

---

[5]It is, of course, not sufficient for purposes of § 2254(d)(1) that our court has spoken if the Supreme Court has not. In *Masoner v. Thurman*, 996 F.2d 1003, 1005 (9th Cir. 1993), we stated that, where a jury convicts of mutually exclusive offenses, the convictions are subject to reversal. We did not reverse in *Masoner*, however, because we concluded that there was no logical inconsistency between convictions for gross vehicular manslaughter while intoxicated and murder. *Id.* at 1005-06.

**[2]** The *Powell* footnote, however, does not state that the question is an open one; it merely states that nothing in the *Powell* opinion decides the issue. The most that can be said of the footnote is that it makes clear that Ferrizz cannot rely on *Powell* as the Supreme Court precedent that the state court's decision contradicted or unreasonably applied. Ferrizz's habeas petition must be supported by some other Supreme Court precedent if it is to succeed.

Ferrizz contends that the state court's decision is contrary to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Duncan v. Louisiana*, 391 U.S. 145 (1968). He concedes that neither case directly involves inconsistent guilty verdicts, but he asserts that each supports a requirement of rationality in the jury verdicts. *Apprendi* requires a jury to determine facts (other than the fact of a prior conviction) that increase a sentence beyond an otherwise-applicable statutory maximum. 530 U.S. at 490. *Duncan* guarantees a jury trial for crimes punishable by terms of imprisonment greater than that accorded petty offenses. 391 U.S. at 161-62. Ferrizz draws from these cases a due process requirement of a rational jury determination, which is violated by inconsistent guilty verdicts.

There is often a question whether a particular application of Supreme Court precedent sought by a habeas petitioner is such an extension of that precedent that the new application cannot be regarded as clearly established federal law. "[T]he difference between applying a rule and extending it is not always clear." *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004). We do know that "it is not necessary for the petitioner to cite factually identical Supreme Court precedent." *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 888 (3d Cir. 1999). The difficulty lies in establishing the proper level of generality at which to assess the rule established by the Supreme Court decision in issue, and many courts have wrestled with that question. *See, e.g., id.*; *Quinn v. Haynes*, 234 F.3d 837, 844-45 (4th Cir. 2000). "If [the Supreme] Court has

not broken sufficient legal ground to establish an asked-for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar." *Williams v. Taylor*, 529 U.S. 362, 381 (2000).

We need not decide, however, whether the rationality requirement for jury verdicts that Ferrizz would extract from *Apprendi* and *Duncan* is too great an extension of the rule of those decisions to pass muster under § 2254(d).[6] Even if we assume, without deciding, that *Apprendi* and *Duncan* clearly established a due process rule of rationality that could be applied to inconsistent guilty verdicts, we conclude that the verdicts in this case did not violate any rationality requirement.

[3] On the present record, we cannot say that a rational jury could not arrive at both of the guilty verdicts in this case. As the state trial judge recognized, there is no inevitable logical inconsistency between the two verdicts. The jury could have found that Ferrizz burglarized the house but found nothing of value, and then on his way out found the ring on the ground outside the window and kept it. Under our circuit's precedent, that possibility would foreclose relief. *See Masoner*, 996 F.2d at 1005 (holding that a due process challenge to allegedly inconsistent guilty verdicts "will not be considered if the defendant cannot demonstrate that the challenged verdicts are necessarily logically inconsistent.").

The state trial judge also recognized, however, that, as the case was framed for the jury, there was a likely factual incon-

---

[6]For the same reasons, we need not decide whether the rule that Ferrizz derives from *Apprendi* and *Duncan* would constitute a new rule that may not be retroactively applied to criminal judgments that have become final. *See Teague v. Lane*, 489 U.S. 288, 301 (1989). Parallel considerations govern whether a rule is "new" under *Teague* and whether it is an extension beyond established federal law under § 2254(d). *See Williams*, 529 U.S. at 379-81.

sistency and the State's attorney candidly admitted to such an inconsistency in oral argument here. We conclude, however, that any such likelihood did not render either verdict irrational.

Two possibilities were presented to the jury: (1) Ferrizz testified that he found the ring on the ground outside the house; and (2) the prosecution introduced evidence of burglary in the form of footprints, palmprints, an unlocked window, and the ring missing from a purse on the wall. Ferrizz argues that, if the jurors did not simply contradict themselves, what must have happened is that some jurors believed that he found the jewelry on the ground and others believed that he took them in the burglary. In that event, he asserts, neither verdict commanded the necessary majority.

The possibility that the verdicts were not unanimous is virtually zero, however, in light of the progress of jury deliberations in this case. After some deliberation, the jury reported to the trial judge that it had reached a unanimous verdict on all the charges except burglary. The judge inquired how the jury was split on burglary, and directed the foreman not to disclose what verdict the split favored or the nature of the verdicts already reached. The foreman answered that the split was eleven to one. The judge sent the jury back to deliberate further and they returned with a verdict of guilty on all of the counts. In light of these facts, it is inconceivable that all the verdicts were not reached unanimously.

[4] The two verdicts also were not irrational when viewed together. A perfectly possible and rational scenario is the following. The jury initially agreed that Ferrizz (at the least) found the jewelry and intended permanently to deprive the owner of it.[7] Nothing in the instructions required the jury to

---

[7]The jury was instructed on the following elements of theft of lost property:

fix the location where he found the ring; he could have found it inside or outside of the house. There was sufficient evidence to support either possibility. As deliberations went on, the jury eventually was able to agree that Ferrizz had burglarized the house. Nothing in the instructions required the jury, in finding a burglary, to reject the possibility that Ferrizz "found" the jewelry in the course of his burglary.[8] *See Masoner*, 996 F.2d at 1006 (rejecting challenge of inconsistency of guilty verdicts when instructions did not require conviction of one offense to negate an element of the other).

[5] In light of the evidence, the jury instructions, and the sequence in which the verdicts were reached, we conclude that the jury did not act irrationally in proceeding as it did. Rational jurors could have agreed first, that at the least Ferrizz had found the ring somewhere and wrongfully intended to keep it, and then could have further found that he did, in fact, commit a burglary to get the ring. There is neither an inevitable logical inconsistency between the two guilty verdicts, nor is there a necessary factual inconsistency that renders the ver-

---

One, a person finds property whose value exceeds $400; two, under circumstances which give him knowledge or means of inquiry as to the true owner; three, the person appropriates the property to his own use, or to the use of another person not entitled thereto; four, without making reasonable and just efforts to find the owner and restore the property; five, when the person appropriated the property to his own use or the use of another, not entitled thereto, he had the specific intent to deprive the owner permanently of that property.

[8]The jury was instructed on the following elements of burglary:

In order to prove this crime, each of the following elements must be proved: a person entering a building; and at the time of the entry, that person had the specific intent to steal and take away someone else's property, and intended to deprive the owner permanently of that property.

The jury was also instructed that "[i]t does not matter whether the intent with which the entry was made was thereafter carried out."

dicts irrational.[9] This is not a case, for example, in which a defendant was convicted of robbing two banks hundreds of miles apart at the same time.

[6] Because the jury could rationally arrive at both guilty verdicts, logically and factually, there was no violation of any rule of rational consistency between guilty verdicts that we assume, without deciding, can be implied from *Apprendi* or *Duncan*. Accordingly, the California Court of Appeal's decision upholding both verdicts was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d). The judgment of the district court dismissing the petition for a writ of habeas corpus is

**AFFIRMED.**

---

[9]We deal here only with the question whether the verdicts were irrational, not with sentencing consequences. The state trial judge consolidated the crimes of theft of loss property and grand theft into one crime of grand theft for sentencing purposes. That consolidation avoided any problem that might arise from a possible violation of legislative intent not to punish burglars for "finding" the property that they stole. *Cf. United States v. Gaddis*, 424 U.S. 544, 549-50 & n.15 (1976) (holding that a person cannot be federally convicted and separately sentenced for robbing a bank and receiving proceeds of that robbery because Congress did not intend to "pyramid penalties" for lesser offenses following the robbery) (quoting *Heflin v. United States*, 358 U.S. 415, 419 (1959)).