Filed 5/12/16  In re J.R. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. _____ THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> J.R., <br><br> Defendant and Appellant. | B263729 <br><br> (Los Angeles County Super. Ct. No. KJ39086) |

APPEAL from a judgment (order of wardship) of the Superior Court of Los Angeles County, Geanene Yriarte, Judge.  Reversed and remanded with directions to dismiss the petition.

Esther R. Sorkin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In general, theft is a taking of property without the owner's consent, "a violation of the victim's possession without the victim's consent." (2 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against Property, §14, p. 37.) Under certain circumstances, a taking of property no longer in the victim's possession is also a crime. Under Penal Code section 485, "One who finds lost property under circumstances which give him knowledge of or means of inquiry as to the true owner, and who appropriates such property to his own use . . . without first making reasonable and just efforts to find the owner and to restore the property to him, is guilty of theft." (Pen. Code, § 485.)

Appellant J.R. was on the school playground on a Friday in October 2013 when she discovered a ring among wood chips on the ground and put it in her pocket. J.R. was 10 years old at the time, a fifth grader at Bixby Elementary School in Hacienda Heights. There is no evidence she knew who owned the ring when she found it. Although the owner reported it missing the following Monday, J.R. did not return it. J.R. later explained, to the owner and a classmate, that J.R. lost the ring after an aunt living in the same household observed it was "very expensive" and advised her not to return it. At the conclusion of the April 20, 2015 adjudication, the trial court entered an order of wardship and placed J.R. on probation, finding she violated Penal Code section 485 by committing felony grand theft of property valued at more than $950. (Pen. Code, §§ 485, 487, subd. (a); Welf. & Inst. Code, § 602.)

J.R. seeks a reversal based on the prosecution's failure to prove she was capable of committing the crime. In California, there is a rebuttable presumption a child under 14 lacks the capacity to commit a crime. (*In re Gladys R.* (1970) 1 Cal.3d 855, 864 (*Gladys R.*); Pen. Code, § 26, par. One.) To rebut the presumption requires clear and convincing evidence the minor understood she engaged in wrongdoing when the crime was committed. In this case, the court made no express finding J.R. had capacity. We find the record does not support an implied finding that, when she found and pocketed the ring, J.R. knew she was engaging in wrongdoing. To the contrary, there is substantial evidence J.R. believed the adage, "finders keepers losers weepers" absolved her of any

2

obligation to make inquiries. We therefore reverse and remand with directions to dismiss the petition.

## *FACTUAL SUMMARY*

1. *People's Evidence.*

    a. *Evidence of capacity.*

The People called two witnesses to address J.R.'s capacity: J.R.'s mother and lifelong caretaker, Gloria M., and Gloria M.'s boyfriend, Gilbert Barrow. Barrow testified he was not appellant's natural father and had been in J.R.'s life just over a year, "maybe 13 months" before his April 20, 2015 testimony. He had an influence on her since then, however, "as far as talking to her," he did not, prior to the October 2013 incident, teach J.R. about right and wrong.

J.R.'s mother provided affirmative answers to the prosecutor's leading questions (to which there was no objection). Gloria M. testified that, before the incident, she taught J.R. about right and wrong and "it's wrong to take other people's property." Gloria M. also testified J.R. gave no indication she did not understand the lesson. Asked whether she taught J.R., "if [J.R.] were to find someone's property, particularly someone's valuable property, that it's right to return that property to someone," Gloria M. answered, "Yes."

    b. *Evidence of the misappropriation of lost property.*

Elizabeth Ortega (the alleged victim) testified she knew J.R. when Ortega worked for several weeks as a "noon aide" in the school cafeteria from about October 10, 2013, through October 18, 2013. Ortega recalled removing her wedding ring at work and placing it in her pocket. She lost it sometime later and was uncertain about when or where she lost it. She noticed it was missing as she was going to her car at about 1:00 p.m. She looked all over the grounds for the ring that day but didn't find it. She asked the office to make an announcement but none was made.

At some point in the following week, Ortega told every student whom she "was seeing" to help her look for it, and offered a $100 reward. She testified she "had a little cheerleading team at that school and they were helping me" look for the ring and "[a] lot

3

of kids [helped look for the ring because] they wanted that reward money." According to Ortega, one child said "she was with [J.R.] when she had the ring and that she mentioned it to her that that was my ring, to give it back." Although one student told Ortega they saw J.R. with the ring, Ortega did not talk to J.R. until several weeks later. Perhaps "three, four weeks after [losing] the ring," Ortega complained to the police and, after filing a police report, conversed with J.R.

As relayed by Ortega, J.R. made the following statements: "she was really sorry that she found my ring and didn't give it back to me"; "she showed it to the aunt and the aunt told her that it looks like a very expensive ring, not to give it back"; and "she took it home and put it in her room and then she said she couldn't find it and that she was really sorry she lost it." Ortega testified (without corroborating evidence or photographs) she paid $2,000 for the ring in 1983, and it was a yellow gold wedding band with a large diamond and small diamonds. Ortega said she looked for the ring but never found it and never got it back.

Robert Miller, a school employee whose job was to promote safety, testified for the prosecution. Miller remembered the incident involving the lost ring as occurring between October 10, 2013, and October 18, 2013. Miller recalled it was a Friday when he observed J.R. pluck a ring out of the wood chips. At the time, Miller was standing nearby "on the playground in the wood chips," in the "5th grade area," talking to another student standing nearby. Miller testified, "I noticed [J.R.] had bent down and picked something out of the wood chips with her finger. I looked over, seen it was a ring. Didn't think twice about it at that time because nobody had reported anything missing." He testified he "went about [his] business." Miller "assumed maybe [J.R.] might have dropped it without [Miller] noticing." Miller remembered the ring as "silver with shiny stones on it" and "a glittery, silver ring," but he did not get a good look at it. Miller testified it was the following Monday morning when Ortega "came in and told me she had searched her house and the car and couldn't find her ring. It was then that I told her what I had seen on the Friday before."

J.R.'s classmate, Jordan K. (who was 12 years old at the time of the April 20, 2015 adjudication) remembered Ortega lost her ring when Jordan K. and J.R. were fifth graders. Jordan K. testified Ortega told the whole school about her ring and everyone wanted to be involved and was trying to help her find it. Jordan K. also remembered seeing fourth and fifth graders looking for the ring in the soccer field.

Jordan K. testified to a conversation she had with J.R. about a week after the ring was reported lost; Jordan K. testified the conversation "was like about a week ago – after we went looking for the ring." (*Sic*.) Jordan K. testified, "[J.R.] told me that her aunt had told her not to give it back to her, to Ms. Ortega, and she said finders keepers, losers weepers." When asked whether J.R. was "kind of teasing like I found it, her loss," Jordan K. answered, "Yes." Jordan K. did not know whether J.R. had actual possession of the ring at that time; Jordan K. testified, "[J.R.] said that she had taken it home and that she lost it somewhere in her room."

2. *Defense Evidence.*

Claudia Aguilar was J.R.'s fifth grade teacher in October 2013 and testified J.R. was "a pretty good student." When asked, "do you have an opinion as to [J.R.'s] integrity," Aguilar answered, "Yes." In response to the question, "Was she an honest child or a thieving child," Aguilar answered, "[h]onest." She also testified that, before the lost ring incident, Ortega expressed "frustrations" with J.R. on a "kind of frequent" basis, complaining J.R. "didn't line up properly or she threw away all her food . . . just every day occurrences that to [Ortega] seemed just as bigger deals than they really were."

Theresa C., an aunt who lived in J.R.'s household at the time, denied J.R. ever showed her a ring and denied ever seeing the ring. She also denied ever telling J.R. to hide the ring or instructing her not to return it. Theresa C. said she "believe[d] [J.R.] in terms of trusting her." As far as Theresa C. could recall, there were allegations that J.R. took the ring. J.R. said she did not have it; Theresa C. testified, "[J.R.] goes, Tia, I didn't get the ring. I didn't find the ring."

Gloria M. testified she searched the house for the ring and could not find it. She also testified J.R. was an "outcast at school" and "very much of an introvert," J.R. did not

5

have many friends, and her "social skills aren't at a peak just yet." Gloria M. recalled that before the October 2013 ring incident, her daughter reported being picked on by girls at school.

### CONTENTION

J.R. contends "there was insufficient admissible evidence to support the finding that [J.R.] appreciated the wrongfulness of the charged conduct." (Capitalization omitted.)

### DISCUSSION

1. *The Court Made No Express Finding of Capacity.*

There is no dispute J.R. was born in August 2003 and was 10 years old when she found the ring in October 2013. As recounted above, Barrow and Gloria M. were the only witnesses who addressed J.R.'s capacity to understand wrongdoing. The court made no express finding J.R. understood the wrongfulness of her conduct. Although the April 20, 2015 adjudication minute order includes a box to be checked beside the words, "Court finds that the *Gladys R.* requirement has been satisfied," that box is not checked. At the conclusion of the April 20, 2015 adjudication, the court found true the allegations in the petition, placed J.R. on probation at home, and ordered payment of $2,000 in restitution to the victim.

2. *Penal Code Section 26 Creates a Presumption of Incapacity for Minors under 14.*

California law presumes children under 14 do not have the capacity to commit a crime. The provision in Penal Code section 26, paragraph One, " 'All persons are capable of committing crimes except those belonging to the following classes: [¶] One–Children under the age of 14, in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness,' " establishes a " 'presumption of a minor's incapacity.' " (*People v. Lewis* (2001) 26 Cal.4th 334, 378 (*Lewis*).)

The presumption applies to proceedings under Welfare and Institutions Code section 602.[1] (*Gladys R., supra,* 1 Cal.3d at p. 867.) "We have long held that a finding of capacity is a prerequisite to an adjudication of wardship for a minor under 14. [Citation.] The prosecution may rebut Penal Code section 26(One)'s presumption of incapacity by producing ' "clear proof" ' that the minor appreciated the wrongfulness of the conduct when it was committed, . . . [Citation.] 'Clear proof' in this context means clear and convincing evidence." (*People v. Cottone* (2013) 57 Cal.4th 269, 280 (*Cottone*).)

"[C]riminal capacity is not an element of the offense." (*In re Manuel L.* (1994) 7 Cal.4th 229, 238 (*Manuel L.*).) "Although Penal Code section 26(One) requires the prosecution to prove that a minor under 14 understood the wrongfulness of his conduct, capacity is not an 'element' of the underlying offense that must be proved beyond a reasonable doubt. [Citation.] Rather, the presumption of incapacity operates to exempt the minor from legal responsibility. [Citations.] In this respect, capacity is similar to the issue of sanity, which is not a fact material to guilt but is a ' "prerequisite to a valid judgment and sentence." ' [Citation.]" (*Cottone, supra,* 57 Cal.4th at p. 281.)

In *Manuel L.*, our Supreme Court stated, "In *Leland* v. *Oregon* [(1951)] 343 U.S. 790, the United States Supreme Court recognized that 'the basic decisions between guilt and innocence and between criminal responsibility and legal insanity' are different in kind [citation], holding that to place the burden on the defendant to prove his insanity at time of the offense does not relieve the prosecution of proving 'all the necessary elements of guilt.' [Citation.] By parity of reasoning, due process is satisfied by Penal Code section 26's requirement that the presumption of a minor's incapacity be rebutted by clear and convincing evidence." (*Manuel L., supra,* 7 Cal.4th at p. 238, fn. omitted.)

---

[1] Welfare and Institutions Code section 602 states, in relevant part, "any person who is under 18 years of age when he or she *violates any law of this state . . . defining crime . . .* , is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court." (Italics added.)

Courts may not infer a minor's knowledge of wrongfulness from the commission of the act itself. (*Lewis, supra,* 26 Cal.4th at p. 378.) On the other hand, a minor's knowledge of the wrongfulness must often be shown by circumstantial evidence. (*In re Tony C.* (1978) 21 Cal.3d 888, 900.) The "minor's 'age is a basic and important consideration [citation], and, . . . it is only reasonable to expect that generally the older a child gets and the closer [he] approaches the age of 14, the more likely it is that [he] appreciates the wrongfulness of [his] acts.' [Citation.]" (*Lewis*, at p. 378.) Other pertinent considerations include " 'the attendant circumstances of the crime, such as its preparation, the particular method of its commission, and its concealment,' " (*ibid.*) and false statements regarding the offense (*id*. at p. 379).

A trial court's finding of capacity may be implied (*In re Paul C.* (1990) 221 Cal.App.3d 43, 52) or express. "We review the entire record in the light most favorable to the judgment and affirm the trial court's findings that the minor understood the wrongfulness of his conduct if they are supported by substantial evidence—that is, evidence that it reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof. [Citation.]" (*In re Joseph H.* (2015) 237 Cal.App.4th 517, 538.) Therefore, the issue with respect to J.R. is whether there was substantial evidence supporting an implied finding of clear and convincing evidence J.R. knew the wrongfulness of her act. (Cf. *id*. at p. 540.)

3. *Penal Code Section 485 Requires Knowledge of Wrongdoing at the Time When the Lost Property is Discovered and Appropriated.*

Penal Code section 485, which criminalizes the misappropriation of lost property, states[2] in relevant part, "One who finds lost property under circumstances which give him knowledge of or means of inquiry as to the true owner, and who appropriates such

---

[2]    Penal Code section 485 was enacted in 1872 and amended once, in 1927 , to substitute the word "theft" for "larceny."

property to his own use . . . without first making reasonable and just efforts to find the owner and to restore the property to him, is guilty of theft."

Penal Code section 485 has four elements. They are: (1) a person finding lost property, (2) under circumstances which give the person knowledge of or means of inquiry as to the true owner, (3) a failure to first make reasonable and just efforts to find the owner and to restore the property to the owner, and (4) an appropriation of such property to the person's own use, or to the use of another person not entitled thereto. (Cf. *People v. Zamani* (2010) 183 Cal.App.4th 854, 863 (*Zamani*).) Specific intent to steal (intent to " 'permanently deprive the owner of his or her property' ") is not an element of proof but the prosecution must prove scienter by establishing the property was found " 'under circumstances which gave him either the knowledge of the true owner or the means to find the true owner.' " (*Id.* at pp. 861, 862.)

The relevant time frame for proof of scienter is when the defendant found the lost property. This is apparent from the language in Penal Code section 485 because the clause "under circumstances which give him knowledge of or means of inquiry as to the true owner" modifies the verb "finds." It does not modify the verb "appropriates" or "making reasonable and just efforts." It therefore follows the trier of fact must evaluate the defendant's state of mind at the time when she found the lost property rather than her state of mind after appropriation.

Indeed, one who innocently finds and appropriates lost property and decides not to return the property after later learning the identity of the owner may be civilly liable for conversion but is not criminally responsible for a theft. As explained by the Supreme Court of Rhode Island[3] in *Atkinson v. Birmingham* (1922) 44 R.I. 123 [116 A. 205] (*Atkinson*), one who learns the owner's identity after finding lost property and nevertheless appropriates the property may be civilly liable but lacks the requisite intent for criminal responsibility. "To render the finder of lost property guilty of larceny such

---

[3]     Because there is a paucity of reported California cases (see p. 13, *post*), we look to other jurisdictions for guidance.

finder must appropriate the same to his own use at the time of finding, when at that time he knows who the owner is or has the immediate means of ascertaining that fact. If for the first time the finder learns the identity of the owner subsequent to the finding and then denies the finding or refuses to deliver the property to the owner, such finder may be civilly liable for conversion but is not guilty of the crime of larceny; for in such circumstances the finder is held not to have taken and carried away the lost property, feloniously, from the actual or constructive possession of the owner." (*Id.* at p. 207; see Annot., Larceny by Finder of Property (1925) 36 A.L.R. 372 [" 'It may reasonably be said not to be a violation of any social duty for a man who finds a lost article to take it home for the purpose of finding out the true owner; and if he does this honestly in the first instance, and afterwards, though he may have discovered the true owner, is seduced into appropriating to his own use, he is not guilty of larceny, though he does wrong.' [Citation.]"].)

Although Penal Code section 485 does not delineate the "circumstances which give [the finder] knowledge or means of inquiry as to the true owner," the relatively few reported California cases addressing section 485 involve a defendant who either knew the owner's identity when he discovered the lost property, or discovered the property in a location that suggested who the owner might be (e.g., cattle straying onto a neighbor's property; a ring discovered outside the victim's bedroom) or under other circumstances providing a clue to the owner's identity (e.g., a wallet with identification). (See *Zamani, supra,* 183 Cal.App.4th 854 [affirming section 485 conviction where defendant was advised Quicksilver circuit boards were stolen when he appropriated them but believed insurance company was true owner when he demanded $1,000 from QuickSilver as a condition of return]; *People v. Stay* (1971) 19 Cal.App.3d 166 [affirming section 485 conviction where defendant found, within six blocks of several markets, shopping carts bearing the names of the markets and demanded a " 'finder's fee' " from the markets as a condition of returning them]; *Ferrizz v. Giubino* (9th Cir. 2005) 432 F.3d 990 [finding no inconsistency in jury verdicts for burglary and misappropriation of lost property where there was testimony the defendant, an employee of a roofing contractor, found victim's

10

wedding ring outside the victim's master bedroom and circumstantial evidence (footprints) indicating he entered the bedroom]; *People v. Baker* (2005) 126 Cal.App.4th 463 [affirming award of quadruple restitution where defendant rancher was convicted under section 485 for failure to return neighbor's cattle after they strayed onto his land]; *In re Greg F.* (1984) 159 Cal.App.3d 466 [reversing order continuing wardship following a finding of theft under section 485 against juvenile who found victim's wallet on a bus and telephoned victim demanding reward]; cf. *People v. Devine* (1892) 95 Cal. 227 [theft conviction reversed for lack of criminal intent where, unbeknownst to defendant, hogs from neighboring ranch were intermixed with his, and defendant failed to notice the other rancher's markings on the hogs before selling them to a third party].)

4. *There is Insufficient Evidence J.R. Knew the Wrongfulness of Her Conduct.*

As a preliminary matter, there is no evidence in the record that, when J.R. plucked the ring from the wood chips, she had any information it belonged to Ortega. Miller, the only witness with a clear memory of the sequence of events, testified J.R. found the ring before Ortega reported it to him as missing. When Miller saw J.R. pick up the ring on a Friday, he thought nothing of it because no one had reported a lost ring. It was the following Monday when Ortega told Miller she had searched her house and car for the ring to no avail. Ortega likewise testified she realized it was gone around 1:00 p.m. and went to the office after searching for the ring. Ortega asked the office to make an announcement but none was made. Ortega asked others to help look for the ring the week following her discovery it was lost.

Because there is no evidence J.R. knew the ring belonged to Ortega when she discovered it, the determination of fault by the court below must have rested on a finding the circumstances under which she found it gave J.R. "means of inquiry as to the true owner." (Pen. Code, § 485.) We therefore examine the record to determine if there is substantial evidence that when J.R. discovered the ring in the wood chips, she knew she had "means of inquiry as to the true owner" and knew it was wrongful not to make inquiry.

11

a. *There is no evidence J.R. knew taking the ring was wrong.*

There is no evidence in the record anyone ever instructed J.R. what to do if she found property under circumstances providing no clue to the owner's identity and with no knowledge anyone had lost it. The questions posed to J.R.'s mother do not address this. To establish capacity, the prosecution asked whether Gloria M. taught J.R. "right from wrong"; that "it's wrong to take other people's property"; and "if [J.R.] were to find someone's property, particularly someone's valuable property, that it's right to return that property to someone." The first two questions are too general to elicit evidence J.R. knew, from the circumstances of her discovery of the ring, it was wrongful not to make inquiries. The answer to the last question is not relevant because it established, at most, that J.R. knew she should return found property *if she knew the identity of the owner*. That lesson would have been pertinent if J.R. had found a wallet containing an identification card or if Ortega's lost ring had been inscribed with Ortega's name or telephone number. Gloria M.'s testimony accordingly provided no probative evidence of capacity. As noted above, Barrow's testimony was similarly unhelpful.

The People also failed to present circumstantial evidence J.R. knew finding and pocketing the ring was wrongful. Miller, the only witness who saw J.R. pick up the ring, did not describe any furtive or unusual behavior suggesting knowledge of wrongdoing. From what Miller saw, J.R. appeared to retrieve her own ring from the wood chips and he thought nothing of it. (Cf. *State v. Morock* (2015) (Ohio Ct.App., Aug. 6, 2015, No. 14AP-559) 2015 WL 4660026 [affirming conviction where victim left approximately $2,000 in cash in an envelope at a grocery store check-out stand and surveillance video showed defendant, the next customer, peek inside the envelope and hold it to his side, out of view of the cashier, before appropriating it].)

The People argue J.R.'s after-the-fact expression of remorse is evidence J.R. had knowledge of wrongdoing. According to the People, "Ortega testified that she informed students of her lost ring and asked them to help her search for it, and that [J.R.] later stated to Ortega that she was 'really sorry' that she found Ortega's ring but did not return it to her. . . . This evidence that [J.R.] expressed remorse for her conduct to the owner of

12

the lost ring reasonably supported the inference that [J.R.] appreciated the wrongfulness of her conduct."

However, as noted above, the relevant time frame for scienter was when J.R. first discovered the ring and took it home. J.R.'s statement she was "sorry" several days or weeks later does not evidence her state of mind when she found and took possession of the ring. Moreover, J.R.'s words of remorse were not about wrongfully finding and appropriating the ring; they were about misplacing the ring. According to Ortega, J.R. said she "was really sorry she *lost* it." (Italics added.)

Because there is no evidence J.R. had any knowledge of wrongdoing on the Friday when she found the ring and took it home with her, there was no substantial evidence of capacity.

b. *The lack of evidence J.R. ever appropriated the ring to her own use defeats a finding she had capacity to wrongfully appropriate.*

To prove a violation of Penal Code section 485, the prosecution had to prove an appropriation of the property to J.R.'s own use, or to the use of another person not entitled to it. (*Zamani, supra,* 183 Cal.App.4th at p. 863.) The record reveals J.R. took the ring home but lost the ring after showing it to her aunt. There is no evidence J.R. knew the ring belonged to Ortega when the ring subsequently went missing. J.R.'s mother searched the house but found no ring. There was no circumstantial evidence J.R. appropriated the ring to her own use such as evidence she wore it, passed it to someone else as a gift, demanded a reward for returning it, or tried to sell it.

Penal Code section 485 contemplates an innocent finding of lost property followed by a wrongful decision to appropriate the property rather than make inquiries warranted under the circumstances of the finding. As the court explained in *Brooks v. State* (1878) 35 Ohio St. 46, 50, "If the property has not been abandoned by the owner, it is the subject of larceny by the finder, when, at the time he finds it, he has reasonable ground to believe, from the nature of the property, or the circumstances under which it is found, that if he does not conceal but deals honestly with it, the owner will appear or be ascertained." Because the record contains no evidence J.R. concealed the property or appropriated the

13

ring for her own purposes, there was likewise no substantial evidence she did so with knowledge it was wrongful.

      c. *J.R.'s belief in "finders keepers losers weepers" negates capacity.*

There is persuasive evidence J.R. believed "finders keepers losers weepers" applied and freed her of any obligation to return the ring. Jordan K. testified that after everyone knew about Ortega's lost ring, "[J.R.] told me that her aunt had told *her* [J.R.] not to give it back to her, to Ms. Ortega, and *she* said finders keepers, losers weepers." (Italics added.) Whether the word "she" in Jordan K.'s testimony referred to J.R. or her aunt, it evidences J.R.'s perception she had no obligation to return the ring. Jordan K.'s observation that J.R.'s demeanor when she said "finders keepers losers weepers" "was kind of teasing like I found it, her loss," underscores the point.

J.R.'s understanding the finders keepers rule absolved her was not unreasonable. As other courts have acknowledged, the "finders keepers" rule is widely known among school children. In *Grande v. Jennings* (2012) 229 Ariz. 584 [278 P.3d 1287], the court stated, "elementary school children like to say 'finders keepers.' " (*Id.* at p. 1290].) In *United States v. Bates* (2009) 584 F.3d 1105, 1110, the Eighth Circuit referred to "the childhood adage 'finders keepers, losers weepers.'" In *United States v. Ortega* (1975) 517 F.2d 1006, the Third Circuit stated, "In the jurisprudence of childhood, 'finders keepers, losers weepers' is accepted as dogma." (*Id.* at p. 1007.)

Indeed, under the circumstances of J.R.'s discovery of the ring, the "finders keepers" rule is arguably a correct statement of the law. As noted above, all of the reported California cases affirming or addressing convictions under Penal Code section 485 involve a defendant who either knew the owner's identity when he found the property or a defendant who discovered property under circumstances providing clues to the owner's identity. The circumstances of the finding in this case -- discovery of an unmarked ring among wood chips on public property (a school playground) -- did not suggest any identifiable owner. While a better choice would have been to turn the ring in to a teacher or to a school administrator in a position to make generalized inquiries

whether anyone lost the ring, there is no reported California case criminalizing a failure to turn in unmarked lost property.

The uncontradicted substantial evidence J.R. knew the finders keepers rule and thought it relieved her of any obligation to make inquiries negates capacity.

d. *The direction from J.R.'s aunt also negates capacity.*

As noted above, a finding of guilt under Penal Code section 485, requires proof the finder appropriated the property to one's use rather than make reasonable inquiries. Also as noted above, there is no evidence J.R. had any consciousness of wrongdoing when she pocketed the ring and took it home. There is evidence J.R. consulted her aunt about what to do with the ring and her aunt said not to return it. Ortega quoted J.R. as saying "the aunt *told her* that it looks like a very expensive ring, *not to give it back*." (Italics added.) Similarly, Jordan K. testified, "[J.R.] told me that her aunt had *told* her not to give it back to her." (Italics added.) Assuming J.R. did not lose Ortega's ring and, instead, appropriated it to her own use, the aunt's advice not to return it is inconsistent with a finding J.R. knew failing to make inquiries or appropriating the ring to her own use was wrongful.

Although the People argue the aunt's (Theresa C.'s) denial that she made these statements suggests J.R. must have fabricated the conversations to cover up her own wrongdoing, the timing of J.R.'s statements undermines this argument. By the time J.R. talked about the aunt's advice, J.R. also said she had lost the ring. Meanwhile, word was out J.R. had possession of it. It is equally plausible, if she fabricated the aunt's advice, she did so to excuse her inability to return what she had already lost. As noted above, one who appropriates lost property with an innocent intent but later learns the identity of the owner commits a civil rather than a criminal wrong. (*Atkinson, ante.*)

15

*DISPOSITION*

The record does not support an implied finding J.R. knew "the wrongfulness of the charged conduct at the time it was committed." (*Manuel L.*, *supra,* 7 Cal.4th at p. 232.) The judgment (order of wardship) is therefore reversed and the matter is remanded to the trial court with directions to dismiss the petition.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


HOGUE, J.[*]

We concur:



ALDRICH, Acting P. J.




LAVIN, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.